UNITED STATES SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| SANDEEP KAUR, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>vs.<br><br>ENVISION HEALTHCARE CORPORATION, EMCARE, INC., and EMCARE IAH EMERGENCY PHYSICIANS PLLC,<br><br>                  Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Sandeep Kaur ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Envision Healthcare Corporation ("Envision"); EmCare, Inc. ("EmCare"); and EmCare IAH Emergency Physicians PLLC ("EmCare-IAH") (collectively, "Defendants"). Plaintiff's allegations are based on information and belief, including the investigation of counsel, except for allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## INTRODUCTION

1.  Plaintiff brings this class action on behalf of all persons residing in the State of Texas who were treated in an emergency department of a hospital that was in-network to their health insurance plans by a health care provider affiliated with Defendants who was out-of-network to their health insurance plans, and received a bill for an amount beyond the reasonable value of the services rendered.

2.  Patients across the country have been hit with large surprise medical bills after unwittingly receiving care from an out-of-network provider. In one common scenario, a patient

seeks treatment at an in-network hospital, only to find out weeks or months later that while the hospital was in-network, the treating physician was out-of-network, and a significant portion of the charges for the physician's services are not covered by the patient's benefit plan.

3. Unconstrained by any negotiated agreement, the out-of-network physician's services may be billed at rates that far exceed the normal charges for the services. The result can be financially disastrous for patients who thought they had nothing to worry about since they had procured health insurance coverage, paid their premiums, and made sure to go to an in-network hospital for treatment. Disturbingly, surprise billing is especially common in emergency departments, where patients may be least able to protect themselves.

4. Plaintiff brings this putative class action because Defendants deny patients an opportunity to bargain and then demand payment of exorbitant charges that exceed the fair market value of out-of-network services rendered, taking unfair advantage of patients. This conduct violates the common law, which provides that in the absence of an express contract or agreement on the price of services, a service provider is only entitled to the reasonable value of the services rendered.

5. Plaintiff and the members of the Class (defined below) have suffered injury due to Defendants' conduct and seek declaratory relief, monetary damages, injunctive and/or other equitable relief, cancellation of debt, and attorneys' fees, costs, and expenses.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendants because Defendants conduct business in this jurisdiction and the actions giving rise to this complaint occurred in this jurisdiction.

7. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), as the amount in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000, and Plaintiff is bringing a class action in which members of the putative Class are citizens of a state different from one or more Defendants.

8. Venue is proper in this Court because, upon information and belief, Defendants conduct business in this jurisdiction, a substantial part of the events giving rise to Plaintiff's claims occurred in this jurisdiction, and Defendants caused harm to Plaintiff and putative Class members residing in this jurisdiction.

## **PARTIES**

9. Plaintiff is a resident of the State of Texas, City of Houston.

10. Defendant Envision is a Delaware corporation, with its principal executive offices located at 1 A Burton Hills Boulevard, Nashville, Tennessee. Defendant Envision can be served through their registered agent at 211 E. 7th Street, Suite 620 Austin, TX 78701-3218 USA.

11. Envision has multiple subsidiaries and/or Affiliated Professional Associations in Texas and regularly conducts business in the State, with business in Texas accounting for a significant portion of Envision's physician services–related net revenue in 2017. *See* Envision Healthcare Corporation's Form 10-K for the fiscal year ended December 31, 2017, filed with the U.S. Securities and Exchange Commission on March 1, 2018 ("2017 10-K") at 3, 48.

12. Envision is a nationwide provider of health care services and related support services, including physician services and a range of management and administrative services (such as clinical staffing and recruiting, scheduling support, billing and collection, operational

improvement programs and risk management). 2017 10-K at 1. Envision Healthcare Corporation conducts its business through operating subsidiaries, including EmCare.[1]

13. Defendant EmCare is a wholly owned subsidiary of Envision. EmCare is incorporated in the State of Delaware, and EmCare's corporate headquarters are located at 13737 Noel Road, Suite 600, Dallas, Texas. Defendant EmCare can be served through their registered agent at 211 E. 7th Street, Suite 620 Austin, TX 78701-3218 USA. EmCare regularly conducts business in Texas.

14. EmCare is a "leading provider of integrated facility-based physician services, including emergency, anesthesiology, hospitalist/inpatient care, radiology, tele-radiology and surgery." 2017 10-K at 69. EmCare contracts with hospitals to staff and manage hospital emergency departments.

15. Defendant EmCare-IAH is a professional limited liability company domiciled in Texas. Defendant EmCare-IAH Emergency Physicians PLLC's corporate headquarters are located at 6200 S. Syracuse Way Suite 200 Greenwood Village, CO 80111 USA. EmCare-IAH Emergency Physicians PLLC can be served through their registered agent at 211 E. 7th Street, Suite 620 Austin, TX 78701-3218 USA.

16. Upon information and belief, EmCare-IAH Emergency Physicians PLLC is an affiliate of EmCare with a contract to provide emergency services at Cypress Fairbanks Medical Center Hospital, where Plaintiff was treated in the emergency department.

---

[1] The term "Envision" also includes all of Envision's subsidiaries, affiliates, and "doing business as" (d/b/a) monikers.

4

## FACTUAL ALLEGATIONS

**"Surprise" Medical Bills**

17. Approximately 1 in 5 privately insured patients who visit in-network emergency departments in the United States are treated by out-of-network physicians and are apt to receive surprise bills for services not covered by their insurance companies. *See* NBER[2] at 3, 8, 29.

18. Surprise medical billing occurs when a patient receives a bill from an out-of-network healthcare provider, whom the patient, acting objectively reasonable, understood to be participating in her insurer's network. This practice is particularly pernicious in the in-network emergency department setting, as patients in medical distress "have a choice over which hospital they attend," but "once they enter a hospital [emergency department], they have little or no discretion over the [emergency department] physician who treats them," and therefore "cannot avoid out-of-network physicians in their chosen hospital." *Id*. at 2-3, 13 n.13. As a result, patients who choose an in-network hospital may nevertheless receive care and a subsequent "surprise" bill from an out-of-network physician. As one of the authors of the NBER Working Paper told *The New York Times*, surprise billing is an "ambushing of patients."[3]

---

[2] Zack Cooper, Fiona Scott Morton, & Nathan Shekita, *Surprise! Out-of-Network Billing for Emergency Care in the United States* (Nat'l Bureau of Econ. Research, Working Paper No. 23623, revised April 2018) (the "NBER Working Paper" or "NBER"). Professor Zack Cooper, PhD, is an Assistant Professor of Health Policy and of Economics at Yale University. Professor Fiona Scott Morton, PhD, is the Theodore Nierenberg Professor of Economics at the Yale University School of Management. Nathan Shekita is a statistician/research associate at Yale University's Institution for Social and Policy Studies. For the Court's convenience, a copy of the NBER Working Paper is attached hereto as Exhibit A.

[3] Julie Creswell, Reed Abelson & Margot Sanger-Katz, *The Company Behind Many Surprise Emergency Room Bills*, N.Y. Times, July 24, 2017, at https://nyti.ms/2tDFLQk (the "NYT Article") (quoting Professor Fiona Scott Morton, PhD). A version of the NYT Article was published in the print edition of *The New York Times* on July 25, 2017, on Page A1, under the headline "Costs Shoot Up As a Company Runs the E.R."

19. Patients face substantial bills if they see an out-of-network emergency department physician. This is not only because patients may be required to pay a greater percentage (or all) of their incurred medical costs if their bills are not covered by insurance. It is also because the total amounts due on their out-of-network bills are substantially higher than the amounts due on in-network bills, even for "identical services." NBER at 3.

20. Whereas bills from in-network physicians must reflect rates negotiated between the physicians and private insurers, Medicaid, or Medicare, out-of-network physicians "face completely inelastic demand when they are practicing inside in-network hospital[s]," and thus "they need not set their prices in response to market forces." *Id*. at 2. Moreover, "[b]ecause patients cannot avoid out-of-network physicians in their chosen hospital, [emergency department] physicians who go out-of-network will not face any reduction in the number of patients they treat." *Id.* at 3. As one insurance company executive has said, "[w]hen emergency room doctors work for a company that has not made a deal with an insurer, they are free to bill whatever they want . . . . 'The more they bill, the more they get paid.'" NYT Article (quoting Shara McClure, an executive with Blue Cross of Texas).

21. According to the data analyzed by the authors of the NBER Working Paper,[4] out-of-network physicians charged, on average, 637% of what Medicare would have paid for identical

---

[4] The final dataset supporting the NBER Working Paper's findings was composed of 8,913,196 patient treatment episodes in emergency rooms that took place between January 1, 2011 and December 31, 2015, which represented nearly $28 billion in aggregate emergency room spending. NBER at 3, 8-9. Moreover, 99% of the episodes studied occurred at in-network hospitals. *Id*. at 19, 41 (Table 1). The data came from a single insurer that operates in all fifty states, who the NBER researchers agreed not to identify. *Id*. at 29; NYT Article. The researchers compared their findings to those of other researchers who analyzed distinct and larger data sets, and observed that the NBER findings were in-line with those of the other researchers, and were therefore generalizable. NBER at 18; *see also* NYT Article ("the national trends in surprise billing detected by the Yale team are consistent with a broader study by

services. NBER at 3, Appendix Table 8. By contrast, in-network physicians who agreed with insurance companies on negotiated rates paid, on average, less than half that amount, or 266% of the corresponding Medicare rates for identical services (which is already higher than what most other specialists are paid). *Id.*

22. While consumers may take representations that they are responsible for the totality of the billed charges at face value, out-of-network emergency care providers are entitled to receive a "reasonable and customary amount," not whatever figure the providers choose to bill.

**Surprise Medical Bills in Texas**

23. The old saying is that "everything's bigger in Texas"—and, unfortunately, that appears to be true when it comes to the problem of surprise billing. Two national studies suggest that surprise bills for emergency medical care are more common in Texas than in most other states.[5] In a 2015 survey, one in fourteen privately insured Texans reported getting a surprise medical bill in the last two years.[6]

24. A 2017 report by the Center for Public Policy Priorities ("CPPP") details key findings of a CPPP analysis of data posted online by three of Texas' largest insurers, revealing that:

---

government researchers").

[5] Christopher Garmon & Benjamin Chartock, One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills, 36(1) Health Affairs 177 (2017); Zack Cooper & Fiona Scott Morton, Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise, 375 N.E.J.M. 1915 (2016).

[6] Consumer Reports National Research Center, *Surprise Medical Bills Survey* (May 2015) http://consumersunion.org/wp-content/uploads/2015/05/CY-2015-SURPRISE-MEDICAL-BILLS-SURVEY-REPORT-PUBLIC.pdf.

- Texas patients are routinely treated by out-of-network physicians at in-network emergency departments.

- There are more than three hundred hospitals that do not have a single in-network emergency department physician for one or more of the insurers covering the hospital.

- There are forty hospitals that are in-network with all three insurers where surprise billing is nonetheless virtually guaranteed: the percentage of out-of-network emergency department physician billing is ninety-five percent or more for all three insurers.[7]

25. Sick and injured Texans who seek care at an in-network emergency department face a real—and sometimes unavoidable—risk of getting hit with surprise medical bills.[8]

**EmCare and Surprise Medical Bills**

26. Over the past several decades, third-party emergency department staffing companies, such as Defendants, have become one of the most substantial sources of out-of-network surprise bills. Hospitals retain these companies to provide emergency department physicians and staff to treat patients seeking emergency care, manage emergency department affairs, and handle billing matters. The two most prominent national emergency department staffing companies, which together control 30% of the entire physician outsourcing market, are EmCare and its chief competitor, TeamHealth. NBER at 7.

---

[7] Stacey Pogue, *A Texas-Sized Problem: How to Limit Out-of-Control Surprise Medical Billing*, CPPP (February 2017), https://forabettertexas.org/surprisebills/ img/2017_HW_SurpriseMedBill.pdf.

[8] The NBER Working Paper notes that "data from the Texas Department of Insurance showed that [from 2012 to 2015] balance-billing complaints in the state increased 1000%." NBER at 11.

27. Once hired by a hospital to manage its emergency department, EmCare staffs physicians and other health care professionals. As a result, in 2017, Envision's physician segment generated over $6.5 billion in net revenue. 2017 10-K at 60.

28. EmCare historically remained out-of-network with insurance providers, even where the hospitals in which EmCare is staffing the emergency department are in-network under various insurance plans. This resulted in surprise balance bills for patients who must seek emergency medical care at these hospitals. Data collected from among 194 hospitals where EmCare worked between 2011 and 2015 demonstrated that 62% of all patient encounters in EmCare-staffed emergency departments were billed as out-of-network. NBER at 4, 12.[9] Specifically, "after EmCare took over the management of emergency services at hospitals with previously low out-of-network rates, they raised out-of-network rates by over 81 percentage points" and "raised its charges by 96 percent relative to the charges billed by the physician groups they succeeded," resulting in total payments (by the insurer observed in the NBER Working Paper) increasing "by 122 percent." *Id*. at 4, 35.

29. The NBER Working Paper also specifically analyzed EmCare's entrance into 16 hospitals between 2011 and 2015. Of those, the NBER Working Paper observed that "after EmCare entered hospitals that previously had low out-of-network billing rates, the likelihood a patient was treated by an out-of-network physician increased to nearly 100%." *Id*. at 22 n.21.[10] By

---

[9] This was much higher than the national average. NYT Article. It was also much higher than TeamHealth's comparable rate during that period of only 13%. NBER at 4.

[10] For purposes of identifying changes in out-of-network billing rates at EmCare facilities, the 16 EmCare hospitals were divided into two groups. *Id*. at 22. The first group of hospitals had pre-entry out-of-network billing rates below 10.1%. *Id*. The second group had pre-entry out-of-network billing rates above 97%. *Id*. The researchers derived their statistics for post-entry changes in out-of-network billing rates solely from the former group, as the hospitals in the latter group logically could not experience significant increases in their already near-100% rates of

contrast, TeamHealth's entry resulted in a much lower increase in out-of-network billing rates, i.e., 33%. *Id*. at 4.

30.  In addition, EmCare's entry into hospitals corresponded with a 43% greater chance that patients' emergency care would be billed at the highest paying billing code, CPT code 99285, i.e., the same code at which Plaintiff was billed. *Id*. at 4, 26.[11] Specifically, emergency department visits can be billed at five codes depending on the nature of the physician services provided. CPT Code 99281 is properly billed when the presenting problem is of low urgency and requires little to no immediate medical care; CPT Code 99282 is properly billed when the presenting problem is of low to moderate urgency and requires low to moderate medical care; CPT Code 99283 is properly billed when the presenting problem is moderately severe and urgent, requiring immediate medical care; and CPT Code 99284 is properly billed when the presenting problem is of high severity and requires immediate care, but does not pose an immediate significant threat to life or physiologic function. American Medical Association, *CPT 2018 Standard Codebook*. CPT Code 99285 is the most expensive code an emergency services provider can charge. It is properly billed when the presenting problem is highly severe and possibly life-threatening, requiring the immediate attention of a physician who, if possible, takes a full history and performs a comprehensive

---

out-of-network billing. *Id*.

[11] "CPT" means Current Procedural Terminology, a medical code set maintained by the American Medical Association and designed to communicate uniform information about medical services and procedures. *See CPT (Current Procedural Terminology)*, American Medical Association, https://www.ama-assn.org/practice-management/cpt-current-procedural-terminology. The CPT code set is used by healthcare service providers, health insurance companies, and accreditation organizations, and is mandated for billing Medicare and Medicaid. Peggy Dotson, *CPT Codes: What Are They, Why Are They Necessary, and How Are They Developed?*, Advances in Wound Care, Dec. 2013), *99285*, CGS Medicare (revised Feb. 2, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3865623/.

examination, and then engages in highly complex medical decision making. *Fact Sheet: CPT Code* https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.

31. Unsurprisingly, EmCare's higher occurrence of being out-of-network with patients' insurance providers and more frequent selection of the most expensive billing code corresponded with, on average, a 117% increase in physician payments, a 96% increase in physician charges, and an 11% increase in hospital facility payments (which was also based on a 23% increase in patient admission rates). NBER at 4, 24, 26.

32. TeamHealth's entry, on the other hand, did not correspond with an increase in "the rate patients [were] admitted to the hospital, or the rate that physicians bill[ed] using the highest paying billing code for emergency care." *Id*. at 4-5.

33. The NYT Article examined EmCare's impact on particular hospitals and patients, and found it to be consistent with the statistical results discussed in the NBER Working Paper. For example, after Newport Hospital and Health Services contracted with EmCare to staff its emergency department in early 2016, patients noticed increased out-of-network billing rates and administrators noticed an increase in the amount of visits being billed at the highest level billing code.

> Before EmCare, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care. After EmCare arrived, nearly 28 percent got the highest-level billing code.
>
> On top of that, the hospital, Newport Hospital and Health Services, was getting calls from confused patients who had received surprisingly large bills from the emergency room doctors. Although the hospital had negotiated rates for its fees with many major health insurers, the EmCare physicians were not part of those networks and were sending high bills directly to the patients. For a patient needing care with the highest-level billing code, the hospital's previous physicians had been charging $467; EmCare charged $1,649.
>
> "The billing scenario, that was the real fiasco and caught us off guard," said Tom Wilbur, the chief executive of Newport Hospital. "Hindsight being 20/20, we never

would have done that." Faced with angry patients, the hospital took back control of its coding and billing.

Newport's experience with EmCare, now one of the nation's largest physician-staffing companies for emergency rooms, is part of a pattern.

34. A doctor at Sutter Coast Hospital noticed a similar "pattern of inflated bills and out-of-network bills" after EmCare took over the hospital's emergency department in 2015. *Id.* (quoting Dr. Gregory Duncan). As a result, Dr. Duncan "joined with other elected officials in asking Sutter Coast to terminate its contract with EmCare." *Id*.

**Plaintiff's Experience**

35. On November 29, 2016, Plaintiff went to the emergency room at Cypress Fairbanks Medical Center Hospital ("Cypress") after sustaining a head injury.

36. Plaintiff had fallen and hit her head, prompting her husband to call an ambulance. When the ambulance arrived, Plaintiff was asked for identification and her insurance card, and the ambulance took her to an in-network hospital.

37. Plaintiff knew that Cypress was an in-network hospital under her medical insurance plan and expected the out-of-pocket cost for the emergency room visit to be limited to her emergency room copay of $100.

38. Weeks later, however, Plaintiff received a bill for $2,844.97 from EmCare-IAH. While the hospital emergency department was in-network, Plaintiff, upon being billed, learned that the emergency department doctor who treated Plaintiff was not.

39. EmCare-IAH charged Plaintiff $2,152 for emergency medical services billed at CPT code 99285.

40. Plaintiff appealed to her insurer, but the insurer determined that the claim was processed correctly pursuant to Plaintiff's benefit plan.

41. Plaintiff made payments on the bill to EmCare-IAH, but the account was ultimately sent to collections. Plaintiff continues to make payments to the collection agency, sending what she can afford.

42. Plaintiff continues to dispute the amount owed.

**Defendants' Billed Rates for Out-of-Network Services are Excessive and Unreasonable**

43. Reasonable rates for out-of-network medical service providers are reflected by the amounts actually *received* by them, not the amounts typically charged. As to the charged rates, hospitals and physicians maintain fee schedules for their services, referred to as "chargemaster lists" (each rate called a "chargemaster rate"). The "defining feature [of a chargemaster rate] is that it is 'devoid of any calculation related to cost' and is not based on market transactions." Barak D. Richman, JD, PhD; Nick Kitzman, JD; Arnold Milstein, MD, MPH; and Kevin A. Shulman, MD, *Battling the Chargemaster: A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, The American Journal of Managed Care, Vol. 23, No. 4, e100-e105, at e101 (April 2017).

44. In his testimony before Congress in March 2006, Gerard F. Anderson—a Professor in the Bloomberg School of Public Health and in the School of Medicine at Johns Hopkins University, as well as the Director of the Johns Hopkins Center for Hospital Finance and Management—explained:

> List prices are established by the hospitals and physicians without any market constraints. Too often list prices have no relationship to the prices that are actually being paid by insurers. The prices should reflect the market place and should not be dictated by only the hospitals and physicians.

*What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs*, 109th Cong. 103, Serial No. 109-70 (March 15, 2006) (testimony of Gerard F. Anderson, Director, Johns Hopkins Center for Health Finance and Management) (hereinafter,

"Anderson Testimony") at 100. Professor Anderson continued, "[u]nder the current system hospitals and physicians have the ability to post any price they choose. There is not a requirement that anyone ever pays that posted price and in fact the posted price is seldom paid." *Id.* at 105. This is because "[t]he hospital or hospital system has complete discretion to set each and every charge on the charge master file. The hospitals often do not know how they set each charge on the charge master file." *Id.* at 106 (emphasis in original). Professor Anderson concluded that "charges are not set by market forces or using a systematic methodology." *Id.*

45. As Envision itself recognizes, "[p]ayments for services provided are generally less than our billed charges." 2017 10-K at 51.

46. Moreover, under the Patient Protection and Affordable Care Act ("ACA") implementing regulations, health insurers must reimburse out-of-network physicians rendering emergency services to their insureds. Health insurers must pay whichever of the following three specified methods yields the highest payment amount: (i) the Medicare rate pursuant to Medicare's Physician Fee Schedule ("PFS"); (ii) the median in-network amount for the service; or (iii) the usual formula used to determine out-of-network reimbursement, which often depends on the "usual and customary rates" in the area. Studies suggest that, based on insurance reimbursement rates alone, providers who do not contract with insurance companies and thus are considered out-of-network generally receive higher reimbursement than in-network providers would for the same services—putting aside any additional sums collected through surprise bills to the patient.

47. Plaintiff was charged an objectively unreasonable amount for the emergency services rendered. Despite Plaintiff's benefits plan's determination, pursuant to ACA regulations, that the allowable charge of $177.62 represented reasonable reimbursement for the services, and the plan's payment of that amount, EmCare-IAH demanded full payment of its billed charge of

$2,152 ($1,974.38 above the allowable charge). This amount is excessive and unreasonable, equal to *more than ten times* the amount Plaintiff's benefit plan calculated as reasonable payment.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this action on behalf of herself and a putative Class of all persons residing in the State of Texas who were provided emergency medical services at an in-network emergency department in Texas by an out-of-network provider affiliated with Defendants and were subsequently billed an amount beyond the reasonable fair market value of the services.

49. This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiff is a proper representative of the putative Class. Excluded from the Class are Defendants and their parents, subsidiaries, representatives, officers, directors, employees, partners, and co-ventures.

50. The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is not known at this time (but can be determined through discovery), Plaintiffs believe that there are thousands, and likely hundreds of thousands, of Class members residing throughout Texas.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual Class members. Among the questions of law and fact that predominate and are common to the Class are:

   a. Whether there can be an express contract between a patient and a health care service provider when the patient is unaware of the independent identity of the health care service provider and that they are entering into a separate transaction;

   b. Whether a contract implied-in-law exists between Defendants and each Class

member;

c. What the price term of any implied-in-law contract is, whether it is whatever the service provider wishes to charge, the quantum meruit or fair market value of the services, or another measure;

d. Whether Defendants' billed rates exceed the reasonable fair market value of the services rendered;

e. Whether Defendants have been unjustly enriched by their inequitable and unlawful conduct; and

f. The proper measure of damages, including monetary and injunctive relief, and other equitable relief.

52. Plaintiff's claims are typical of the claims of the Class, in that Plaintiff experienced the harms alleged and was damaged thereby. Plaintiff seeks to obtain relief for herself and the Class for the harm arising out of the violations of law set forth herein.

53. Plaintiff is a member of the Class and will fairly and adequately protect the interests of the other members of the Class. Plaintiff's interests align, and do not conflict, with those of the other members of the Class. Plaintiff has retained counsel competent and experienced in complex consumer class action litigation and who will devote sufficient time and resources to litigate this matter.

54. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Since the damages suffered by the members of the Class may be relatively small in comparison to the expense and burden of individual litigation, it is virtually impossible for Plaintiff and members of the Class to individually seek redress for the wrongful conduct alleged

herein. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

55. As alleged herein, Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

**Breach of Implied Contract or Quasi-Contract**

56. Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

57. Under Texas law, it is well-established that a contract is implied by law in circumstances where the parties neglected to form one, but equity nonetheless requires payment for beneficial services rendered and knowingly accepted, including between the provider of medical services and the recipient of those services where the parties themselves did not create a valid, express contact governing the transaction.

58. The provider is entitled to the reasonable value of the services rendered.

59. Defendants breached the terms of the implied contract by billing Plaintiff and other Class members at excessive rates much higher than the reasonable value implied by law.

60. Defendants were unjustly enriched through their breach of the implied contract, to the detriment of Plaintiff and other Class members.

61. Defendants should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched them.

62. Plaintiff further seeks an order enjoining Defendants from engaging in any unlawful or inequitable acts and practices as alleged herein, including, but not limited to, enjoining Defendants from charging and/or seeking the collection of excessive rates from patients for their services.

63. There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

g. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as Class representative, and designate the undersigned as Class counsel;

h. Award Plaintiff and the Class monetary damages;

i. Award Plaintiff and the Class equitable, declaratory, and/or injunctive relief;

j. Award Plaintiff and the Class restitution and/or disgorgement;

k. Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

l. Grant Plaintiff and the Class payment of reasonable attorneys' fees;

m. Grant such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 10, 2019

WOLF POPPER LLP

By: _____
Jeffrey W. Chambers
Pennzoil Place
711 Louisiana St. Suite 2150
Houston, Texas 77002
(713) 438-5244
jchambers@wolfpopper.com

*Liaison Counsel for Plaintiff*

OF COUNSEL:

WOLF POPPER LLP
Chet B. Waldman
Elissa Hachmeister
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cwaldman@wolfpopper.com
ehachmeister@wolfpopper.com

*Counsel for Plaintiff*