UNITED STATES SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| SANDEEP KAUR and CINDY DORIN, individually and on behalf of all others similarly situated, | : : : : : | CASE NO.: 4:19-cv-02480 |
| Plaintiffs, | : : : | **AMENDED CLASS ACTION COMPLAINT FOR IMPLIED-IN-LAW CONTRACT OR QUASI-CONTRACT** |
| vs. | : : : | |
| ENVISION HEALTHCARE CORPORATION, EMCARE, INC., EMCARE IAH EMERGENCY PHYSICIANS PLLC, and OLD SETTLERS EMERGENCY PHYSICIANS, PLLC, | : : : : : : : | **JURY TRIAL DEMAND** |
| Defendants. | : | |

This Amended Complaint is filed pursuant to Fed. R. Civ. P. 15(a)(2) with the previously-obtained written consent of Defendants.

Plaintiffs Sandeep Kaur and Cindy Dorin ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Envision Healthcare Corporation ("Envision"); EmCare, Inc. ("EmCare"); EmCare IAH Emergency Physicians PLLC ("EmCare-IAH"); and  Old Settlers Emergency Physicians, PLLC ("Old Settlers") (collectively, "Defendants").  Plaintiffs' allegations are based on information and belief, except for allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.  The information and belief allegations are based on the investigation of counsel, which included, among other things, a review of the following:  (i) public filings by Envision with the U.S. Securities and Exchange Commission ("SEC"); (ii) various

websites of certain of the Defendants and the hospitals at which they perform services; (iii) certain news and scholastic articles; (iv) certain research papers, journals, and published reports; (v) publications by the American Medical Association and Medicare; (vi) Congressional testimony relating to certain of the Defendants and certain billing issues; (vii) filings with various Texas governmental agencies; and (viii) relevant health insurance regulations, all as specified below.

## **INTRODUCTION**

1.      Plaintiffs bring this class action on behalf of all persons who received emergency services in the emergency department of an in-network hospital in Texas from an out-of-network physician practice affiliated with Defendants and were billed for charges in excess of the reasonable value of the emergency services rendered.

2.      Patients across the country have been hit with large medical bills after unwittingly receiving care from an out-of-network health care provider.  In one common scenario, a patient seeks treatment at an in-network hospital, only to find out weeks or months later that while the hospital was in-network, the treating physician was out-of-network, and a significant portion of the charges for the physician's services are not covered by the patient's health insurance or plan.

3.      Unconstrained by any negotiated agreement, the out-of-network physician's services may be billed at exorbitant rates that far exceed the normal charges for the services.  The result can be financially disastrous for patients who thought they had

nothing to worry about since they had procured health coverage, paid their premiums, and made sure to go to an in-network hospital for treatment.

4.      Plaintiffs bring this putative class action because Defendants deny patients an opportunity to bargain and then demand payment of exorbitant charges that far exceed the fair value of the out-of-network services rendered, taking unfair advantage of patients. This conduct violates the common law, which provides that in the absence of an express contract or agreement on the price of services, a service provider is only entitled to the reasonable value of the services rendered.

5.      Plaintiffs and the members of the Class (defined below) have suffered injury due to Defendants' conduct and seek declaratory relief, monetary damages, injunctive and/or other equitable relief, cancellation of debt, and attorneys' fees, costs, and expenses.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over Defendants because Defendants conduct business in the State of Texas and the actions giving rise to this complaint occurred in the State of Texas.

7.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), as the amount in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000, and Plaintiffs are bringing a class action in which members of the putative Class are citizens of a state different from one or more Defendants.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## PARTIES

9.     Plaintiff Sandeep Kaur ("Plaintiff Kaur") is a resident of the State of Texas, City of Houston.

10.     Plaintiff Cindy Dorin ("Plaintiff Dorin") is a resident of the State of Texas, City of Sherman.

11.     Defendant Envision is a Delaware corporation, with its principal executive offices located at 1A Burton Hills Boulevard, Nashville, Tennessee.  Envision has multiple subsidiaries and/or affiliated physician practices in Texas and regularly conducts business in the State, with business in Texas accounting for a significant portion of Envision's physician services–related net revenue in 2017.  *See* Envision Healthcare Corporation's Form 10-K for the fiscal year ended December 31, 2017, filed with the U.S. Securities and Exchange Commission on March 1, 2018 ("2017 10-K") at 3, 48. Envision noted that while it conducted business in 45 states, it had "a significant presence" in five states, including Texas; those five states collectively accounted for approximately 62% of Envision's physician services segment net revenue in 2017.  *Id.* at 3, 8, 35.

12.     Envision is a nationwide provider of health care services and related support services, including physician services and a range of management and administrative services (such as clinical staffing and recruiting, scheduling support, billing and collection, operational improvement programs and risk management).  2017

4

10-K at 1.  Envision Healthcare Corporation conducts its business through operating subsidiaries, including EmCare.[1]

13.     Defendant EmCare is a wholly owned subsidiary of Envision.  EmCare is incorporated in the State of Delaware, and EmCare's corporate headquarters are located at 13737 Noel Road, Suite 600, Dallas, Texas.  EmCare regularly conducts business in Texas.

14.     EmCare is a "leading provider of integrated facility-based physician services, including emergency, anesthesiology, hospitalist/inpatient care, radiology, tele-radiology and surgery."  Envision Form 10-Q for the period ended September 30, 2016, at 43.

15.     EmCare is in the business of staffing and managing hospital emergency departments.  EmCare may contract directly with a hospital to provide physician staffing and management services, or a physician-owned professional corporation may contract with the hospital to provide physician staffing and management services, and the physician-owned professional corporation, in turn, contracts with EmCare for management and administrative services, including billing.

16.     Defendant EmCare-IAH is a professional limited liability company domiciled in Texas.  EmCare-IAH's mailing address is the same as Envision's: 1A Burton Hills Boulevard, Nashville, Tennesee.  EmCare-IAH's "Registered Office Street Address" is 211 East 7th Street, Suite 620, Austin, Texas.

---

[1] The term "Envision" also includes all of Envision's subsidiaries, affiliates, and "doing business as" (d/b/a) monikers.

17.     Upon information and belief, EmCare-IAH is an affiliate of EmCare with a contract to provide emergency services in the emergency department at Cypress Fairbanks Medical Center Hospital, where Plaintiff Kaur was treated in the emergency department.

18.     Defendant Old Settlers is a professional limited liability company domiciled in Texas.  Like EmCare-IAH, Old Settlers' "Registered Office Street Address" is 211 East 7th Street, Suite 620, Austin, Texas, and its mailing address is the same as Envision's, 1A Burton Hills Boulevard, Nashville, Tennessee.

19.     Upon information and belief, Old Settlers is an affiliate of EmCare with a contract to provide emergency services in the emergency department at Baylor Scott & White Surgical Hospital at Sherman, 3601 North Calais Street, Sherman, Texas ("Baylor").  Plaintiff Dorin was treated in Baylor's emergency department.

## FACTUAL ALLEGATIONS

**Balance Billing and Surprise Medical Bills**

20.     Approximately 1 in 5 privately insured patients who visit in-network emergency departments in the United States are treated by out-of-network physicians and may receive surprise bills for emergency department physician services.  *See* NBER[2] at 3, 8, 29.

---

[2] Zack Cooper, Fiona Scott Morton, & Nathan Shekita, *Surprise! Out-of-Network Billing for Emergency Care in the United States* (Nat'l Bureau of Econ. Research, Working Paper No. 23623, March 2018) (the "NBER Working Paper" or "NBER").  Professor Zack Cooper, PhD, is an Assistant Professor of Health Policy and of Economics at Yale University.  Professor Fiona Scott Morton, PhD, is the Theodore Nierenberg Professor of Economics at the Yale University School of Management.  Nathan Shekita is a statistician/research associate at Yale University's

21.     Balance billing occurs when an out-of-network health care provider bills a patient for the difference between the provider's charge and the "allowed amount" or maximum amount the patient's health insurance or plan will pay.  Balance billing leads to surprise medical bills when a patient reasonably thought the out-of-network health care provider would be participating in her insurer or plan's network.

22.     Balance billing for emergency services rendered in an in-network emergency department is particularly troubling, as patients in medical distress "have a choice over which hospital they attend," but "once they enter a hospital [emergency department], they have little or no discretion over the [emergency department] physician who treats them," and therefore "cannot avoid out-of-network physicians in their chosen hospital."  *Id*. at 2-3, 13 n.13.  Thus, patients who choose an in-network hospital may nevertheless receive care and a subsequent surprise balance bill from an out-of-network physician.  As one of the authors of the NBER Working Paper told *The New York Times*, surprise billing is an "ambushing of patients."[3]

23.     Patients face substantial bills if they see an out-of-network emergency department physician.  The out-of-network emergency physician services may not be fully covered by their health insurer or plan, and, to add insult to injury, the total amounts

---

Institution for Social and Policy Studies.  For the Court's convenience, a copy of the NBER Working Paper is attached hereto as Exhibit A.

[3] Julie Creswell, Reed Abelson & Margot Sanger-Katz, *The Company Behind Many Surprise Emergency Room Bills*, N.Y. Times, July 24, 2017, at https://nyti.ms/2tDFLQk (the "NYT Article") (quoting Professor Fiona Scott Morton, PhD).  A version of the NYT Article was published in the print edition of *The New York Times* on July 25, 2017, on Page A1, under the headline "Costs Shoot Up As a Company Runs the E.R."

due may be substantially higher than the amounts normally paid for identical services. NBER at 3.

24.     Whereas bills from in-network physicians must reflect rates negotiated between the physicians and private insurers, Medicaid, or Medicare, out-of-network physicians "face completely inelastic demand when they are practicing inside in-network hospital[s]," and thus "they need not set their prices in response to market forces."  *Id*. at 2.  "Because patients cannot avoid out-of-network physicians in their chosen hospital, [emergency department] physicians who go out-of-network will not face any reduction in the number of patients they treat."  *Id.* at 3.  As one insurance company executive has said, "[w]hen emergency room doctors work for a company that has not made a deal with an insurer, they are free to bill whatever they want . . . . 'The more they bill, the more they get paid.'"  NYT Article (quoting Shara McClure, an executive with Blue Cross of Texas).

25.     According to the data analyzed by the authors of the NBER Working Paper,[4] out-of-network physicians charged, on average, 637% of what Medicare would

---

[4] The final dataset supporting the NBER Working Paper's findings was composed of 8,913,196 patient treatment episodes in emergency departments that took place between January 1, 2011 and December 31, 2015, which represented nearly $28 billion in aggregate emergency department spending.  NBER at 3, 8-9.  Moreover, 99% of the episodes studied occurred at in-network hospitals.  *Id*. at 19, 41 (Table 1).  The data came from a single insurer that operates in all fifty states, who the NBER researchers agreed not to identify.  *Id*. at 29; NYT Article.  The researchers compared their findings to those of other researchers who analyzed distinct and larger data sets, and observed that the NBER findings were in-line with those of the other researchers, and were therefore generalizable.  NBER at 29; *see also* NYT Article ("the national trends in surprise billing detected by the Yale team are consistent with a broader study by government researchers").

have paid for identical services.  NBER at 3, Appendix Table 8.  By contrast, the bargained-for, negotiated rates paid to in-network physicians were, on average, less than half that amount, or 266% of the corresponding Medicare rates for identical services (which is already higher than what most other specialists are paid).  *Id.*

26.     While consumers may take representations that they are responsible for the totality of the billed charges at face value, out-of-network emergency department health care providers are entitled to receive a "reasonable and customary amount," not whatever they choose to bill.

### Balance Billing and Surprise Medical Bills in Texas

27.     The old saying is that "everything's bigger in Texas"—and, unfortunately, that appears to be true when it comes to the problem of surprise billing.  Two national studies suggest that surprise bills for emergency medical care are more common in Texas than in most other states.[5]  In a 2015 survey, one in fourteen privately insured Texans reported getting a surprise medical bill in the last two years.[6]

28.     A 2017 report by the Center for Public Policy Priorities ("CPPP") details key findings of a CPPP analysis of data posted online by three of Texas' largest insurers, revealing that:

---

[5] Christopher Garmon & Benjamin Chartock, One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills, 36(1) Health Affairs 177 (2017); Zack Cooper & Fiona Scott Morton, Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise, 375 N.E.J.M. 1915 (2016).

[6] Consumer Reports National Research Center, *Surprise Medical Bills Survey* (May 2015) http://consumersunion.org/wp-content/uploads/2015/05/CY-2015-SURPRISE-MEDICAL-BILLS-SURVEY-REPORT-PUBLIC.pdf.

- Texas patients are routinely treated by out-of-network physicians at in-network emergency departments.

- There are more than three hundred hospitals that do not have a single in-network emergency department physician for one or more of the insurers covering the hospital.

- There are forty hospitals that are in-network with all three insurers where surprise billing is nonetheless virtually guaranteed: the percentage of out-of-network emergency department physician billing is ninety-five percent or more for all three insurers.[7]

29.     Sick and injured patients who seek care at an in-network emergency department in Texas face a real risk of getting hit with exorbitant, unexpected medical bills.[8]

**<u>EmCare's Balance Billing</u>**

30.     Over the past several decades, third-party emergency department staffing companies, such as Envision, have become one of the most substantial sources of out-of-network surprise bills.  Hospitals retain these companies to staff emergency department physicians, manage emergency department affairs, and handle billing matters.  The two

---

[7] Stacey Pogue, *A Texas-Sized Problem: How to Limit Out-of-Control Surprise Medical Billing*, CPPP (February 2017), https://forabettertexas.org/surprisebills/ img/2017_HW_SurpriseMedBill.pdf.

[8] The NBER Working Paper notes that "data from the Texas Department of Insurance showed that [from 2012 to 2015] balance-billing complaints in the state increased 1000%."  NBER at 8.

most prominent national emergency department staffing companies, which together control 30% of the entire physician outsourcing market, are EmCare and its chief competitor, TeamHealth.  NBER at 7.

31.     In 2017, Envision's physician services segment generated over $6.5 billion in net revenue.  2017 10-K at 60.

32.     EmCare historically remained out-of-network with health insurers and plans, even when the hospital emergency departments where its affiliated physicians worked were in-network under various health insurance and plans.  This resulted in surprise balance bills for patients who must seek emergency department care at these hospitals.  Data collected from among 194 hospitals where EmCare worked between 2011 and 2015 demonstrated that 62% of all patient encounters in EmCare-staffed emergency departments were billed as out-of-network.  NBER at 4, 12.[9]  Specifically, "after EmCare took over the management of emergency services at hospitals with previously low out-of-network rates, they raised out-of-network rates by over 81 percentage points" and "raised its charges by 96 percent relative to the charges billed by the physician groups they succeeded," resulting in total payments (by the insurer observed in the NBER Working Paper) increasing "by 122 percent."  *Id.* at 4, 35.

33.     The NBER Working Paper also specifically analyzed EmCare's entrance into 16 hospitals between 2011 and 2015.  Of those, the NBER Working Paper observed that "after EmCare entered hospitals that previously had low out-of-network billing rates,

---

[9] This was much higher than the national average.  NYT Article.

the likelihood a patient was treated by an out-of-network physician increased to nearly 100%." *Id*. at 22 n.21.

34.    In addition, EmCare's entry into hospitals corresponded with a 43% greater chance that patients' emergency department care would be billed using the highest paying billing code, CPT code 99285, i.e., the same code at which Plaintiff Kaur was billed. *Id*. at 4, 26.[10]

35.    Emergency evaluation and management services can be billed using five codes depending on the nature of the physician services provided.  CPT Code 99281 is properly billed when the presenting problem is of low urgency and requires little to no immediate medical care; CPT Code 99282 is properly billed when the presenting problem is of low to moderate urgency and requires low to moderate medical care; CPT Code 99283 is properly billed when the presenting problem is moderately severe and urgent, requiring immediate medical care; and CPT Code 99284 is properly billed when the presenting problem is of high severity and requires immediate care, but does not pose an immediate significant threat to life or physiologic function.  American Medical Association, *CPT 2018 Standard Codebook*.  CPT Code 99285 is the most expensive of

---

[10] "CPT" means Current Procedural Terminology, a medical code set maintained by the American Medical Association and designed to communicate uniform information about medical services and procedures.  *See CPT (Current Procedural Terminology)*, American Medical Association, https://www.ama-assn.org/practice-management/cpt-current-procedural-terminology.  The CPT code set is used by health care service providers, health insurance companies, and accreditation organizations, and is mandated for billing Medicare and Medicaid. Peggy Dotson, *CPT Codes: What Are They, Why Are They Necessary, and How Are They Developed?*, Advances in Wound Care, Dec. 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3865623/.

the emergency evaluation and management codes.  It is properly billed when the

presenting problem is highly severe and possibly life-threatening, requiring the

immediate attention of a physician who, if possible, takes a full history and performs a

comprehensive examination, and then engages in highly complex medical decision

making.  *Fact Sheet: CPT Code 99285*, CGS Medicare (revised Feb. 12, 2019),

https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.

36.     Unsurprisingly, EmCare's lower network participation and higher use of

the most expensive billing code corresponded with, on average, a 117% increase in

physician payments, a 96% increase in physician charges, and an 11% increase in

hospital facility payments (which was also based on a 23% increase in patient admission

rates).  NBER at 4, 24, 26.

37.     A *New York Times* article examined EmCare's impact on particular

hospitals and patients.  After Newport Hospital and Health Services contracted with

EmCare to staff its emergency department in early 2016, patients noticed increased out-

of-network billing rates and administrators noticed an increase in the amount of visits

being billed at the highest level billing code.

> Before EmCare, about 6 percent of patient visits in the hospital's emergency
> room were billed for the most complex, expensive level of care.  After
> EmCare arrived, nearly 28 percent got the highest-level billing code.
>
> On top of that, the hospital, Newport Hospital and Health Services, was
> getting calls from confused patients who had received surprisingly large bills
> from the emergency room doctors.  Although the hospital had negotiated
> rates for its fees with many major health insurers, the EmCare physicians
> were not part of those networks and were sending high bills directly to the
> patients.  For a patient needing care with the highest-level billing code, the

hospital's previous physicians had been charging $467; EmCare charged $1,649.

"The billing scenario, that was the real fiasco and caught us off guard," said Tom Wilbur, the chief executive of Newport Hospital.  "Hindsight being 20/20, we never would have done that." Faced with angry patients, the hospital took back control of its coding and billing.

Newport's experience with EmCare, now one of the nation's largest physician-staffing companies for emergency rooms, is part of a pattern.

38.     A doctor at Sutter Coast Hospital noticed a similar "pattern of inflated bills and out-of-network bills" after EmCare took over the hospital's emergency department in 2015.  *Id*. (quoting Dr. Gregory Duncan).  As a result, Dr. Duncan "joined with other elected officials in asking Sutter Coast to terminate its contract with EmCare." *Id*.

**Plaintiff Kaur's Experience**

39.     On November 29, 2016, Plaintiff Kaur went to the emergency department at Cypress Fairbanks Medical Center Hospital ("Cypress") after sustaining a head injury.

40.     Plaintiff Kaur had fallen and hit her head, prompting her husband to call an ambulance.  When the ambulance arrived, Plaintiff Kaur was asked for identification and her insurance card, and the ambulance took her to an in-network hospital.

41.     Plaintiff Kaur knew that Cypress was an in-network hospital under her medical insurance plan and expected the out-of-pocket cost for the emergency department visit to be limited to her emergency department copay of $100.

42.     Plaintiff Kaur and Defendants did not enter into negotiations with respect to the fee to be charged at any time during the emergency department visit, nor did Defendants inform Plaintiff Kaur of the rates they charge for their services.

14

43.     Weeks later, however, Plaintiff Kaur received a bill from EmCare-IAH. While the hospital emergency department was in-network, Plaintiff Kaur, upon being billed, learned that the emergency department physician who treated her was not.

44.     EmCare-IAH charged $2,152.00 for emergency services billed using CPT code 99285.  The allowed amount for the service was $177.62, and EmCare-IAH billed Plaintiff Kaur for the balance of the billed charges for the service, $1,974.38.

45.     EmCare-IAH charged $931.00 for emergency services billed using CPT code 12002 (a simple wound repair code).  The allowed amount for this service was $60.41, and again EmCare-IAH billed Plaintiff Kaur for the balance of the billed charges for the service, $870.59.  In total, the amount due on the balance bill was $2,844.97.

46.     Plaintiff Kaur appealed to her health insurance company, but it determined that the claim was processed correctly pursuant to Plaintiff Kaur's health insurance plan.

47.     Plaintiff Kaur made payments on the bill to EmCare-IAH, but the account was ultimately sent to collections.  Plaintiff Kaur continues to make payments to the collection agency, sending what she can afford.

48.     Plaintiff Kaur continues to dispute the amount owed.

**Plaintiff Dorin's Experience**

49.     On March 11, 2019, Plaintiff Dorin went to the emergency department at Baylor after seriously injuring her foot.

50.     Baylor was an in-network hospital under Plaintiff Dorin's health plan.

51.     Plaintiff Dorin was seen in the emergency department by a physician. Plaintiff Dorin asked the physician if he was in-network and he told her not to worry about that and to just worry about fixing her broken foot.

52.     Plaintiff Dorin and Defendants did not enter into negotiations with respect to the fee to be charged at any time during the emergency department visit, nor did Defendants inform Plaintiff Dorin of the rates they charge for their services.

53.     Months later, Plaintiff Dorin received a bill from Old Settlers.  While the Baylor hospital emergency department was in-network, the emergency department physician who treated her was not.

54.     Plaintiff Dorin's bill reflected a charge of $1,117.00 for emergency services billed using CPT code 99283.

55.     Plaintiff Dorin's health plan determined that the reasonable and customary charge for the emergency services was $668, and paid Dr. Thompson $668.  Plaintiff Dorin's health plan deemed the remaining $449 to be in excess of the reasonable and customary charges for the emergency department services rendered.

56.     Defendants billed Plaintiff Dorin for the balance of the charges, $449.

57.     Defendants made no meaningful attempts during Plaintiff Dorin's emergency department visit to inform her that the emergency department of the hospital was staffed or managed by Defendants.

**Defendants' Billed Rates for Out-of-Network Services Are Excessive and Unreasonable**

58.     The "reasonable value" of services may also be described as the "going rate" for the services.  Services are worth what people ordinarily pay for them, e.g., in the health care context, what health care providers *actually receive* for services, not what health care providers charge, as those prices are unilaterally set and may bear little or no relationship to the amounts typically paid for those services.

59.     Hospitals and physicians maintain fee schedules for their services, referred to as "chargemaster lists" (each rate called a "chargemaster rate").  The "defining feature [of a chargemaster rate] is that it is 'devoid of any calculation related to cost' and is not based on market transactions."  Barak D. Richman, JD, PhD; Nick Kitzman, JD; Arnold Milstein, MD, MPH; and Kevin A. Shulman, MD, *Battling the Chargemaster: A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, The American Journal of Managed Care, Vol. 23, No. 4, e100-e105, at e101 (April 2017).

60.     In his testimony before Congress in March 2006, Gerard F. Anderson—a Professor in the Bloomberg School of Public Health and in the School of Medicine at Johns Hopkins University, as well as the Director of the Johns Hopkins Center for Hospital Finance and Management—explained:

> List prices are established by the hospitals and physicians without any market constraints.  Too often list prices have no relationship to the prices that are actually being paid by insurers.  The prices should reflect the market place and should not be dictated by only the hospitals and physicians.

*What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs*, 109th Cong. 103, Serial No. 109-70 (March 15, 2006) (testimony of Gerard F. Anderson, Director, Johns Hopkins Center for Health Finance and Management) (hereinafter, "Anderson Testimony") at 100.  Professor Anderson continued, "[u]nder the current system hospitals and physicians have the ability to post any price they choose.  There is not a requirement that anyone ever pays that posted price and in fact the posted price is seldom paid."  *Id.* at 105.  This is because "[t]he hospital or hospital system has complete discretion to set each and every charge on the charge master file.  The hospitals often do not know how they set each charge on the charge master file."  *Id.* at 106 (emphasis in original).  Professor Anderson concluded that "charges are not set by market forces or using a systematic methodology." *Id.*

61.     As Envision itself recognizes, "[p]ayments for services provided are generally less than our billed charges."  2017 10-K at 51.

62.     Moreover, under the Patient Protection and Affordable Care Act ("ACA") implementing regulations, a health insurer or plan must reimburse out-of-network physicians for emergency services.  A health insurer or plan must pay whichever of the following three specified methods yields the highest payment amount: (i) the Medicare rate pursuant to Medicare's Physician Fee Schedule ("PFS"); (ii) the median in-network amount for the service; or (iii) the usual formula used to determine out-of-network reimbursement, which often depends on the "usual and customary rates" in the area.  This

regulation sets a "floor" for health insurance or plan reimbursement for out-of-network emergency physician services.

63.     Plaintiff Kaur was charged an unreasonable amount for the emergency services rendered.  Despite Plaintiff Kaur's insurance plan's determination, pursuant to ACA regulations, that payments of $177.62 and $60.41 represented reasonable reimbursement for the emergency services, EmCare-IAH demanded full payment of its billed charges of $2,152.00 ($1,974.38 above the allowed amount) and $931.00 ($870.59 above the allowed amount), leaving Plaintiff Kaur with a balance bill of $2,844.97.

64.     Defendants' charges were excessive and unreasonable, with the charge for the service billed using CPT 99285 equaling *more than ten times* the amount Plaintiff Kaur's health plan calculated as reasonable payment, while the charge for the service billed using CPT code 12002 is *over fifteen times* the amount her health plan calculated as reasonable payment.

65.     Plaintiff Dorin was also charged an unreasonable amount for the emergency services rendered.  Old Settler's charge of $1,117.00 for services billed using CPT code 99283 is far above the average in-network rate for the same services, in the same region, which is $312.00—less than a third of what Old Settlers charged.

66.     Despite Plaintiff Dorin's health plan's determination that $668 represented reasonable reimbursement for the services, and the plan's payment of that amount, Old Settlers has demanded full payment of its billed charge of $1,117.00 ($449.00 above the allowed amount).

67.     Studies suggest that, based on health insurer and plan reimbursement rates alone, health care providers who do not contract with health insurers or plans and thus are considered out-of-network generally receive higher reimbursement than in-network health care providers would for the same services—and that's putting aside any additional sums collected through balance billing.

68.     Defendants' charges are excessive and unreasonable, and it would be unjust for Plaintiffs to be required to pay the balance of the full billed charges.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action on behalf of themselves and a putative Class of all persons who received emergency services in the emergency department of an in-network hospital in Texas from an out-of-network physician practice affiliated with Defendants and were billed charges in excess of the reasonable value of the services rendered.

70.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are proper representatives of the putative Class.  Excluded from the Class are Defendants and their parents, subsidiaries, affiliates, representatives, officers, directors, employees, partners, and co-ventures.

71.     The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is not known at this time (but can be determined through discovery), Plaintiffs believe that there are

thousands, and likely hundreds of thousands, of Class members residing throughout Texas.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual Class members.  Among the questions of law and fact that predominate and are common to the Class are:

a.  Whether there can be an express contract between a patient and a health care service provider when the patient is unaware of the independent identity of the health care service provider and that they are entering into a separate transaction;

b.  Whether a contract implied-in-law exists between Defendants and each Class member;

c.  What the price term of any implied-in-law contract is, whether it is whatever the service provider wishes to charge, the quantum meruit or fair value of the services, or another measure;

d.  Whether Defendants' billed rates exceed the reasonable fair value of the services rendered;

e.  Whether Defendants have been unjustly enriched by their inequitable and unlawful conduct; and

f.  The proper measure of damages, including monetary and injunctive relief, and other equitable relief.

73.     Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs experienced the harms alleged and were damaged thereby.  Plaintiffs seek to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

74.     Plaintiffs are members of the Class and will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs' interests align, and do not conflict, with those of the other members of the Class.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation and who will devote sufficient time and resources to litigate this matter.

75.     A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small in comparison to the expense and burden of individual litigation, it is virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged herein.  Plaintiffs know of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

76.     As alleged herein, Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I — IMPLIED-IN-LAW CONTRACT OR QUASI-CONTRACT

77.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs.

78.     Plaintiffs and Class members do not have an express or implied-in-fact contract with Defendants for emergency department services.

79.     Under Texas law, a contract implied in law, or quasi-contract, is an obligation imposed by law regardless of any actual agreement between the parties.  This equitable doctrine prevents a party from obtaining a benefit from another by, among other things, unjust enrichment or because of an undue advantage.

80.     An implied-in-law contract exists between Defendants and each Plaintiff for the emergency services rendered to each Plaintiff.  An implied-in-law contract exists between Class members who were provided emergency department services at an in-network hospital by an out-of-network health care provider affiliated with Defendants.

81.     Defendants are entitled only to the reasonable value of the services billed using CPT codes 99281-99285, and other emergency services that were provided by Defendants in an emergency department to Plaintiffs and Class members.

82.     Defendants charged Plaintiffs and Class members unreasonable amounts for emergency services.

83.     Defendants would be unjustly enriched were Plaintiffs and Class members to pay the amounts billed.  Defendants were unjustly enriched by Class members who did pay them more than the reasonable value for emergency services.

84.     Defendants took undue advantage in charging Plaintiffs and Class members unreasonable amounts for emergency services.

85.     Plaintiffs and Class members seek a declaration that the amounts Defendants billed for emergency department services were unreasonable, were the result of Defendants' taking undue advantage of Plaintiffs and the Class members, and, if paid, would unjustly enrich Defendants; and that if not already paid, need not be paid.

86.     Defendants should be compelled to provide restitution, and to disgorge into a common fund or constructive trust for the benefit of the Class, or to otherwise return to each Class member:

a.      all proceeds Defendants received from the Class as a result of:  charging an unreasonable amount for emergency department services and balance billing patients; any act described herein that unjustly enriched them; or, Defendants' taking undue advantage.

b.      the amounts paid by the Class to debt collectors as a result of: charging an unreasonable amount for emergency department services and balance billing; or, Defendants' taking undue advantage.

87.     Plaintiffs further seek an order enjoining Defendants from engaging in the inequitable acts and practices as alleged herein, including, but not limited to, enjoining

Defendants from charging and/or seeking the collection of unreasonable rates from patients for their services.  Plaintiffs further seek an order compelling Defendants to write-off balance billed amounts still due in excess of the reasonable value of the services rendered.  Plaintiffs further seek an order requiring Defendants to take measures which include, but are not limited, to the following:  inform debt collection firms to whom they have sent balance bills of the type described in this Complaint that the bills are invalid, and take any other appropriate steps to vitiate the balance bills that seek the payment of an unreasonable amount on their face that have been sent to debt collectors.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that the Court award the following relief:

a. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class representatives, and designate the undersigned as Class counsel;

b. Award Plaintiffs and the Class monetary damages;

c. Award Plaintiffs and the Class equitable, declaratory, and/or injunctive relief;

d. Award Plaintiffs and the Class restitution and/or disgorgement;

e. Grant Plaintiffs and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

f. Grant Plaintiffs and the Class payment of reasonable attorneys' fees;

g.  Grant such other relief as the Court may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs demand a trial by jury of all issues so triable.

DATED: December 20, 2019

Respectfully submitted,

**WOLF POPPER LLP**

By: <u>*s/ Chet B. Waldman*</u>
Chet B. Waldman (admitted *pro hac vice*)
Patricia I. Avery (admitted *pro hac vice*)
David A. Nicholas (S.D. Tx. Bar No. 896677)
Elissa M. Hachmeister (admitted *pro hac vice*)
845 Third Avenue, 12th Floor
New York, New York 10022
cwaldman@wolfpopper.com
pavery@wolfpopper.com
dnicholas@wolfpopper.com
ehachmeister@wolfpopper.com
 (212) 759-4600

and

Jeffrey W. Chambers
711 Louisiana, Suite 215
Houston, TX 77002
jchambers@wolfpopper.com
 (713) 438-5244

*Attorneys for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I hereby certify the following:

I am not a party to the above case, and am over eighteen years old.  On December 20, 2019, I served true and correct copies of the foregoing document (including its accompanying Exhibit A), by posting the document electronically to the ECF website of the United States District Court for the Southern District of Texas, for receipt electronically by the Parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 20, 2019, by Patricia I. Avery.

/s/ Patricia I. Avery
Patricia I. Avery