## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SANDEEP KAUR and CINDY DORIN, individually and on behalf of all others similarly situated, | Case No. 4:19-cv-02480 |
| Plaintiffs, | **PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND INCORPORATED MEMORANDUM OF LAW** |
| vs. | |
| ENVISION HEALTHCARE CORPORATION, EMCARE, INC., EMCARE IAH EMERGENCY PHYSICIANS PLLC, and OLD SETTLERS EMERGENCY PHYSICIANS, PLLC, | |
| Defendants. | |

## **TABLE OF CONTENTS**

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT.............................................................................................. 1

INCORPORATED MEMORANDUM OF LAW ........................................................... 1

I.        INTRODUCTION ........................................................................................... 1

II.       PROCEDURAL HISTORY............................................................................ 3

III.      THE PROPOSED SETTLEMENT ............................................................... 5

          A.    Class Definition ................................................................................. 5

          B.    Monetary Relief to the Class.............................................................. 6

          C.    Changed Practices............................................................................... 7

          D.    Limited Release of Claims.................................................................. 7

          E.    Attorneys' Fees and Expenses, and Class Representative Service  Awards........... 8

          F.    Notice .................................................................................................. 8

          G.    The Claims Administrator................................................................... 9

          H.    Claims Administration and Notice Costs.......................................... 10

IV.       ARGUMENT ................................................................................................ 10

          A.    Standards for Preliminary Approval ................................................. 10

          B.    The Proposed Settlement is Fair, Reasonable, and Adequate............................... 11

                1.    The Class Representatives and Class Counsel Have Adequately Represented the Class. ............................................................. 14

2.    The Settlement Was Negotiated at Arm's Length and There Was No Fraud or Collusion................................................................. 16

3.    The Relief Provided for the Class Is Adequate.......................................... 18

　　a.    The Costs, Risk, and Delay of Trial and Appeal. .......................... 18

　　b.    The Range of Possible Recovery. ................................................. 19

　　c.    The Effectiveness of the Proposed Method of Distributing Relief to the Class. ..................................................................................... 20

　　d.    The Terms of the Proposed Award of Attorneys' Fees. ............... 22

　　e.    Other Agreements Made in Connection with the Proposal. ......... 22

　　f.    Opinions of Class Counsel, Class Representatives, and Absent Class Members........................................................................... 22

4.    The Settlement Treats Settlement Class Members Equitably................... 23

C.    The Court Will Likely Be Able to Certify the Class for Purposes of Settlement. 24

D.    The Proposed Notice Warrants Approval .......................................... 29

1.    The Proposed Method of Giving Notice Warrants Approval. ................... 30

2.    The Form and Substance of the Proposed Notice Warrants Approval. ..... 30

V.    CONCLUSION...................................................................................... 32

**PLAINTIFFS' UNOPPOSED MOTION FOR
<u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>**

Plaintiffs hereby move this Court for an order: (1) preliminarily approving the proposed Settlement[1]; (2) directing notice to the Class; and (3) scheduling a Final Approval Hearing.

Plaintiffs respectfully request that this Motion, which Defendants do not oppose[2], be granted.

<u>**INCORPORATED MEMORANDUM OF LAW**</u>

## I.    <u>INTRODUCTION</u>

The proposed Settlement is an extraordinary result for the Class, offering complete or near-complete monetary relief to every interested Class Member who submits a valid claim—relief that will be worth hundreds, if not thousands, of dollars on average.

Plaintiffs brought this Action on behalf of patients who received care from an out-of-network provider affiliated with Defendants at an in-network emergency room in Texas, later receiving a "balance bill"—sometimes called a "surprise medical bill"—for the difference between the billed charges for the out-of-network provider's services and the charges allowed under the patient's health insurance or plan.  Plaintiffs allege that Defendants, who are in the business of staffing hospital emergency rooms with health care providers, routinely fail to make any disclosures regarding out-of-network

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Settlement Agreement, which is attached as Exhibit A to the Declaration of Chet B. Waldman in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (the "Waldman Decl."), submitted herewith.

[2] While Defendants do not oppose the Motion, they do not adopt Plaintiffs' statements or characterizations of the arguments in support of the Motion.

emergency room providers at in-network emergency rooms and then charge excessive rates for out-of-network emergency services.

Plaintiffs argue that under well-established common law principles, when a patient receives emergency medical care and does not have the time, ability, opportunity, or information needed to negotiate the terms of the transaction (or, indeed, to even appreciate that they are entering into a separate transaction with an out-of-network provider), a fair contract is implied by law for the reasonable value of the services rendered. Plaintiffs allege that Defendants' billed charges for out-of-network emergency services far exceed the fair market value of the services provided, and challenge Defendants' practice of sending balance bills demanding full payment of these charges.

Defendants deny that their disclosures were insufficient or that their charges for emergency services were unreasonable. Defendants maintain that they did nothing wrong, and they vigorously contest whether this case can be maintained as a class action outside the settlement context.

Under the proposed Settlement, Defendants have agreed to write off billed amounts that exceed the "Allowable Charge" or maximum amount that a Class Member's health insurance or plan would pay for the out-of-network emergency services, provided that a Class Member timely submits a valid claim. Defendants have further agreed to refund any payments made in excess of the Allowable Charge, including payments made after Defendants sold or otherwise transferred interest in the contested debt to a collection agency, provided again that a Class Member timely submits a valid claim.

The proposed Settlement also provides nonmonetary benefits for the Class and the larger public through provisions requiring Defendants to request, in writing, that any hospital they contract with make certain specified disclosures, which would alert patients to the possibility of receiving out-of-network care at an in-network emergency room and provide them with the information needed to determine the network participation of emergency room providers.  In sum, the proposed Settlement not only allows Class Members to make a complete recovery, but also requires that Defendants take steps to help patients avoid unexpected bills going forward.

In deciding whether to grant preliminary approval and approve sending notice of the proposed Settlement to the Class, the Court must determine: (1) whether it will likely be able to certify the Class for purposes of settlement; (2) whether it will likely be able to approve the proposed Settlement; and (3) whether the Parties' proposed Notice provides the best notice practicable under the circumstances.  As discussed below, all requirements for preliminary approval are met.  Plaintiffs respectfully request that the Court preliminarily approve the proposed Settlement; direct notice of the proposed Settlement to the Class; and set a schedule for settlement proceedings, including final approval of the proposed Settlement.

## II.   **PROCEDURAL HISTORY**

On July 9, 2019, Plaintiff Kaur filed the initial class action complaint in this Action.  ECF No. 1.  Defendants filed an answer on September 4, 2019.  ECF No. 19.  On December 20, 2019, an amended class action complaint was filed with the Court, adding

Plaintiff Dorin.  ECF No. 25.  Defendants filed an answer to the amended class action complaint on January 17, 2020.  ECF No. 28.

The Parties served initial disclosures pursuant to Federal Rule of Civil Procedure 26(a), and negotiated a protective order governing the production of confidential documents by the Parties.  Waldman Decl., ¶ 7.  Plaintiffs served Defendants with discovery requests including document requests and interrogatories.  The Parties engaged in significant meet and confer efforts to resolve discovery disputes, meeting telephonically on multiple occasions and exchanging detailed letters regarding their positions.  The Parties also negotiated an ESI discovery protocol.  Waldman Decl., ¶ 8.

Plaintiffs served a subpoena to produce documents on third party Kohlberg Kravis Roberts & Co. ("KKR"), a private equity firm that acquired Defendant Envision in 2018, and subsequently engaged in efforts to address KKR's responses and objections to the subpoena.  Waldman Decl., ¶ 10.

The Parties' counsel had, after substantial litigation, entered into a settlement in a similar case in California styled *Bozart v. Envision Healthcare Corp.*, Case No. 5:17-cv-01935-FMO-SHK (C.D. Cal).  The *Bozart* settlement was reached with the assistance of an experienced mediator, and was only finalized after hard-fought, comprehensive settlement negotiations that spanned nearly a year.  Waldman Decl., ¶ 12.  The Parties' counsel subsequently agreed to settle another similar case pending in Arizona state court, styled *Kline v. Envision Healthcare Corp.*, Case No. CV2019-003061 (Ariz. Super. Ct.), along the same lines.  Waldman Decl., ¶ 13.  However, initial discussions regarding a

4

possible analogous settlement of this Action did not progress far, and the Parties

proceeded with discovery under the assumption that this Action would be resolved

though litigation.  Waldman Decl., ¶ 14.

The Parties entered into serious settlement negotiations in October 2020.

Waldman Decl., ¶ 14.  Although counsel for both Parties were thoroughly familiar with

the factual and legal issues and had previously negotiated similar settlements,

negotiations over the detailed language of the Settlement Agreement and associated

notices and forms nonetheless proved intensive, taking several months.  Waldman Decl.,

¶ 15.

While the Parties had discussed whether they could agree to an amount of

attorneys' fees and expenses that Plaintiffs would apply for, and that Defendants would

not object to, the Parties did not reach any such agreement until after reaching agreement

on the material terms of class relief.  Waldman Decl., ¶ 16.

## III.    **THE PROPOSED SETTLEMENT**

### A.    **Class Definition**

If approved, the proposed Settlement would apply to a Class of patients who went

to an in-network facility in Texas and received out-of-network emergency services from a

provider affiliated with Defendants between July 9, 2015, and January 29, 2021.

Settlement Agreement, 1.9.

### B.    Monetary Relief to the Class

Class Members may obtain monetary relief in two forms.  First, Class Members

may obtain a *write-off* of any outstanding balances in excess of the "Allowable Charge"

(i.e., the maximum amount of the billed charges that a Class Member's health insurance

or plan deemed payable) for out-of-network emergency services by timely remitting a

claim to the Claims Administrator that includes (1) an Explanation of Benefits ("EOB")

from the Class Member's health insurance or plan indicating the Allowable Charge and

(2) payment or proof of payment for the services amounting to the Allowable Charge.

Settlement Agreement, 4.2.1.  Payments made by a Class Member's health insurance or

plan, including payments made to Defendants directly, will be credited toward payment

of the Allowable Charge.  Settlement Agreement, 4.2.1.  Importantly, agreements by

Class Members to make payments totaling the Allowable Charge—for example, through

an installment plan—will be considered sufficient to satisfy the payment or proof of

payment requirement.  Settlement Agreement, 4.2.1, n.2.

If a Class Member was sent to collections and the collection agency is billing the

Settlement Class Member, the Settlement Class Member must additionally submit a copy

of the invoice(s) from the collection agency, and Defendants will make arrangements to

have any outstanding debt for out-of-network emergency services satisfied if the

Allowable Charge has been paid.  Settlement Agreement, 4.2.3.

Second, eligible Class Members may obtain a *refund* of any payments made by the

Class Member—to Defendants or to a third party, such as a collection agency—in excess

6

of the Allowable Charge, provided that they timely remit a claim to the Claims Administrator that includes (1) an EOB from the Class Member's health insurance or plan indicating the Allowable Charge for the anesthesia services, and (2) proof that the Class Member made payment for the services exceeding the Allowable Charge. Settlement Agreement, 4.3.1.

Defendants will make such refunds and write-offs within thirty days of the later of (a) the Claims Administrator sending the list of Claimants entitled to a write-off and/or a refund to Defendants; or (b) the Effective Date.  Settlement Agreement, 5.2.11.

### C.    Changed Practices

Defendants will request, in writing, that all Texas facilities with emergency rooms staffed by Defendants include certain disclosures (1) in bold print in a document provided to patients, and (2) in a prominent posting in the emergency department.  Settlement Agreement, 4.1.1.  The contemplated disclosures would inform patients:  that emergency room health care providers may be out-of-network even when the hospital is in-network; that patients may call a specified number to find out the name of the physician group providing emergency room services; and that patients should check with their health insurance or plan to determine the network status of the physician group.  Settlement Agreement, 4.1.1.

### D.    Limited Release of Claims

In consideration for the above relief, Class Members will release all claims that were or could have been asserted in the lawsuit relating to:  (i) the pricing of out-of-

network emergency services provided at a Texas facility by an affiliate of Defendants; and (ii) the sufficiency of disclosures by Defendants about out-of-network emergency room providers at in-network facilities in Texas and the rates for out-of-network emergency services. Settlement Agreement, 1.32. Thus, Class Members are not giving up claims unrelated to the specific practices challenged in this case.

### E.    Attorneys' Fees and Expenses, and Class Representative Service Awards

Defendants will pay, separate from and in addition to the relief already discussed, any award of attorneys' fees and expenses, and any class representative service awards, subject to Court approval. Settlement Agreement, 8.2, 9.2. Any such amounts paid by Defendants will not diminish the amounts given to the Class in write-offs and refunds.

### F.    Notice

Notice will be accomplished through mailing a Postcard Notice, attached as Exhibit C to the Settlement Agreement, directly to individual Class Members by first-class mail and making available a Long-Form Notice, attached as Exhibit B to the Settlement Agreement, which will be hosted on a settlement website in downloadable form and, upon request, printed and mailed to a Class Member. *See* Settlement Agreement, 5.2.7. The settlement website will also make available other relevant documents such as the Settlement Agreement, the Claim Form, the Opt-Out/Exclusion Form, and key court filings and orders. Settlement Agreement, 5.2.3.3.

Defendants will provide a database to the Claims Administrator that will include the names and last known mailing addresses, and, if known or reasonably practicable to

obtain, telephone numbers and email addresses, for all Class Members.  Settlement

Agreement, 5.2.3.1.  The Claims Administrator will check each address against the

United States Post Office National Change of Address Database before sending the

Postcard Notice by first class mail to each Class Member.  The Claims Administrator will

conduct a reasonable search to locate an updated address for any Class Member whose

Postcard Notice is returned as undeliverable (and re-mail the Postcard Notice), in

addition to updating addresses based on any forwarding information received from the

United States Post Office and requests received from Class Members.  Settlement

Agreement, 5.2.3.2.

The Postcard Notice is informative and easy to read, providing information about

the nature of the action, the benefits available under the proposed Settlement, and the

rights and options of Class Members, including their right to object to any provision of

the Settlement and their right to "opt out" or exclude themselves.  It also explains how a

Class Member may obtain more information regarding the Settlement.  The Long-Form

Notice clearly lays out the procedures for submitting a claim and the procedures for

requesting exclusion or objecting.

### G.    The Claims Administrator

The Settlement Agreement provides that Rust Consulting, Inc. ("Rust" or the

Claims Administrator"), the claims administrator overseeing the substantially similar

settlements in the *Bozarth* and *Kline* cases, will be retained to serve as Claims

Administrator in this Action, subject to the approval of the Court.  It will be the

responsibility of the Claims Administrator to facilitate notice to the Class, which will include (i) the mailing of the printed Postcard Notice by first class mail to the Class Members; (ii) the creation and maintenance of the settlement website containing relevant documents from the litigation; (iii) responding to inquiries from Class Members; (iv) identifying Class Members who are entitled to write-offs and refunds, and mailing refund checks; and (v) making requisite filings with the Court concerning the Settlement, the Notice Program, and the administration of the Settlement.  Settlement Agreement, 5.2.7.

### H.    Claims Administration and Notice Costs

Defendants shall bear all costs associated with the provision of notice to Class Members and all costs of claim administration.  Settlement Agreement, 5.1.  Any amounts paid by Defendants to the Claims Administrator or toward notice costs will not reduce the relief available to Class Members.

## IV.   <u>ARGUMENT</u>

### A.    Standards for Preliminary Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval of any settlement, voluntary dismissal, or compromise of class action claims.  2018 amendments to Rule 23(e) clarified the process for assessing and approving class action settlements.  Under Rule 23(e)(1), a district court weighing a grant of preliminary approval must determine whether the prospects for class certification and approval of the proposed settlement justify giving notice to class members.  Before a court will direct notice to the class regarding a proposed settlement, the parties must show that the court *will likely be able*

*to*: (i) approve the proposed settlement under Rule 23(e)(2); and (ii) certify the proposed

class for settlement purposes.  If these two elements are satisfied, the court will consider

whether the proposed method of giving notice satisfies the requirements set out in Rule

23(c)(2)(B).  Here, all of the requirements for preliminary approval are met:  the

proposed Settlement is fair, adequate, and reasonable, and this Court will likely to be able

to approve the proposed Settlement after the final approval hearing; this Court will likely

be able to certify the Class upon final approval; and both the procedure for providing

notice and the form and content of the proposed Notice warrant approval.

### B.    The Proposed Settlement is Fair, Reasonable, and Adequate

A court cannot approve a settlement unless it finds that it is fair, reasonable, and

adequate.  Fed. R. Civ. P. 23(e).  The amended Rule 23(e)(2) sets out specific factors that

a court *must* consider in deciding whether a proposed settlement is "fair, reasonable, and

adequate," including whether: (1) the class representatives and class counsel have

adequately represented the class; (2) the settlement was negotiated at arm's length; (3)

the relief provided for the class is adequate, taking into account: (i) the costs, risks, and

delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing

relief to the class, including the method of processing class member claims; (iii) the terms

of any proposed award of attorneys' fees, including timing of payment; and (iv) any other

agreement made in connection with the settlement agreement; and (4) the proposed

settlement treats class members equitably relative to each other.  While the specified

factors are not meant to be exhaustive or to exclude other factors courts have traditionally

applied in determining whether a settlement is fair, adequate, and reasonable, the goal of the amendment was "to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment.

The advisory committee's note explains that the first two factors might be described as "procedural" concerns since they focus on the conduct of the litigation and negotiations leading up to the settlement. *Id.* The court is to look at the actual performance of counsel acting on the behalf of the class. *Id.* Relevant considerations include whether counsel had an adequate information base to negotiate on behalf of the class; the conduct of negotiations, including whether a neutral mediator or facilitator was involved; the treatment of any attorneys' fees for plaintiffs' counsel, including the manner of negotiating the fee award and its terms. *Id.*

The third and fourth factors go to the "substantive" terms of the proposed settlement. *Id.* The relief the settlement will provide to class members is a "central concern." *Id.* Another central concern is the cost and risk of continued litigation, as well as the range of possible recoveries. *Id.* Where a class has not yet been certified, the court may consider the likelihood of class certification if the settlement were not approved. *Id.*

The fourth factor is concerned with inequitable treatment of some class members. The advisory committee's note provides examples of relevant inquiries: "whether the apportionment of relief among class members takes appropriate account of differences

12

among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*

Courts in the Fifth Circuit have traditionally considered six factors in determining whether a settlement is fair, adequate, and reasonable: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). Like the factors in amended Rule 23(e)(2), the *Reed* factors effectively require the court and lawyers to show that a proposed settlement is both procedurally and substantively fair.[3]

---

[3] *Reed* factors that address procedural concerns include: "the existence of fraud or collusion behind the settlement," *accord* Fed. R. Civ. P. 23(e)(2)(B) (directing the court to consider whether "the proposal was negotiated at arm's length") and Fed. R. Civ. P. 23(e)(2)(A) (directing the court to consider whether "class counsel have adequately represented the class"); and "the stage of the proceedings and the amount of discovery completed," *accord* Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment ("[T]he nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base."). *Reed* factors that focus on the substantive terms of the proposed settlement include: "the complexity, expense, and likely duration of the litigation," *accord* Fed. R. Civ. P. 23(e)(2)(C)(i) (directing the court to take into account "the costs, risks, and delay of trial and appeal" in considering whether the relief provided for the class is adequate); "the probability of plaintiffs' success on merits," *accord* Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment ("Often, courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results."); "the range of possible recovery," *accord id.*; and "the opinions of the class counsel, class representatives, and absent class members." Thus, there is significant overlap between the amended Rule 23(e)(2) factors (and sub-factors) and the *Reed* factors, and to the extent that the prescribed considerations under each

This Circuit has recognized a strong public policy preference for settlement of class action lawsuits. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (recognizing an "overriding public interest" in favor of settlement of class action suits).

Consideration of the Rule 23(e)(2) factors and the *Reed* factors shows that the proposed Settlement is procedurally and substantively fair. Because the proposed Settlement is fair, reasonable, and adequate in all respects, this Court should find that it will likely be able to approve the proposed Settlement.

### 1. The Class Representatives and Class Counsel Have Adequately Represented the Class.

In determining whether to approve the Settlement, the Court should consider whether the representative plaintiffs and plaintiffs' counsel "have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Here, the Representative Plaintiffs retained counsel with extensive experience with complex class action litigation, including significant experience litigating consumer class actions in the health care context. *See* Waldman Decl., ¶ 26. Plaintiffs' counsel have been investigating surprise medical bills for years, and have litigated (or are engaged in litigating) ten consumer class actions challenging practices and policies that lead to surprise medical bills. Moreover, Plaintiffs' counsel have been investigating and litigating claims against Defendants

standard differ, the two standards nonetheless remain entirely consistent with each other. Both are addressed in the sections below.

Envision and EmCare for almost four years, and indeed have litigated and settled substantially similar cases in California and Arizona.

Plaintiffs' counsel are thoroughly familiar with the factual and legal issues presented in these cases, and have vigorously litigated this Action from its inception. Among other things, Plaintiffs' counsel:  conducted an extensive investigation of the claims asserted in the Action; researched and drafted a detailed complaint and amended complaint; consulted with experts in the field of health care economics; sought third-party discovery from KKR, obtaining and reviewing more than 500 pages of documents; vigorously pursued discovery from Defendants and engaged in extensive meet-and-confer efforts to resolve discovery disputes and prioritize discovery; reviewed thousands of pages of documents produced by Defendants; and engaged in hard-fought, comprehensive settlement negotiations with Defendants.  *See* Waldman Decl., ¶¶ 8-15.

Plaintiffs' counsel had an adequate information base to negotiate on behalf of Plaintiffs and the Class.  Because of their efforts in this and other cases, Plaintiffs' counsel were well-positioned to evaluate the merits of Plaintiffs' case, Defendants' defenses, and the proposed Settlement.  The record reveals no reason to doubt that Plaintiffs and the Class were fairly and adequately represented throughout the course of negotiations.  It instead shows that Plaintiffs' counsel have adequately represented Plaintiffs and the putative Class throughout the litigation, and ultimately secured an outstanding result for the Class.

15

Likewise, the Representative Plaintiffs have diligently and adequately represented the putative Class. Each Representative Plaintiff dedicated significant time to litigation activities, including producing documents, reviewing the complaints and other case documents, and consulting with Plaintiffs' counsel regarding the claims and legal theories advanced in the Action, the status of the case, and the terms of the proposed Settlement. *See* Declaration of Sandeep Kaur in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Kaur Decl."), attached as Exhibit B to the Waldman Decl., and Declaration of Cindy Dorin in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Dorin Decl."), attached as Exhibit C to the Waldman Decl. The Representative Plaintiffs have no conflicts of interest with other Class Members and have claims that are typical of the claims of other Class Members. Accordingly, and as discussed in more detail below, the Representative Plaintiffs have adequately represented the Settlement Class. This factor supports approval of the Settlement.

## 2. The Settlement Was Negotiated at Arm's Length and There Was No Fraud or Collusion.

Consideration of Rule 23(e)(2)(B) and the first *Reed* factor also support approval. There is no evidence of fraud or collusion here. Instead, the Settlement follows active litigation and vigorous arms-length negotiations by experienced counsel. *See* Waldman Decl., ¶¶ 7-16. The Parties contemplated a settlement substantially similar to the settlement in *Bozarth*, which the Parties' counsel had negotiated with the assistance of the Honorable Dickran Tevrizian (Ret.), an experienced and well-respected mediator.

Waldman Decl., ¶¶ 12, 15.  The *Bozarth* settlement was reached following a formal, in-person mediation session, which included the preparation of detailed mediation statements, but only after nearly a year of additional negotiations, which continued to be facilitated by the mediator.  Waldman Decl., ¶ 12.  In this case, even with an agreed-upon model for the Settlement, the Parties engaged in active, contentious negotiations over a period of months in order to resolve disputes over the appropriate application of that framework, and to reach agreement on the detailed language of the Settlement Agreement, Claim Form, and Notice materials.  Waldman Decl., ¶ 15.

Counsel for both Parties are experienced in the conduct and resolution of this type of litigation, and, as previously noted, have litigated and settled similar cases in other jurisdictions.  Counsel for the Parties understand the key questions of fact and law presented, and discussed those issues repeatedly and at length in the months preceding settlement talks as they worked in good faith to prioritize Defendants' document production.  *See* Waldman Decl., ¶ 8.  In sum, the Parties were represented by experienced, informed counsel who were well-equipped to gauge the strengths and weaknesses of their respective positions and weigh the benefits of settlement against further litigation.  *See, e.g.*, *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063-65 (S.D. Tex. 2012) (approving settlement where parties engaged in arm's-length negotiations with the benefit of discovery to gauge the strengths and weaknesses of the case). The circumstances of the

17

Settlement's negotiation support that it is a fair compromise, informed by each Party's expected outcome but also the costs and risks of continued litigation on both sides.

### 3. The Relief Provided for the Class Is Adequate.

#### a. The Costs, Risk, and Delay of Trial and Appeal.

Rule 23(e)(2)(C)(i) and the second *Reed* factor further support approval. Litigating the claims to resolution would undoubtedly prove complex and consume significant time, money, and judicial resources. Even if Plaintiffs prevailed at every stage, and further assuming that Plaintiffs could obtain through litigation the benefits that this Settlement provides—as discussed below, both are far from assured—years of costly pre-trial, trial, and appellate proceedings would stand between the Class and any recovery. *See, e.g.*, *Heartland*, 851 F. Supp. 2d at 1064 (approving settlement where litigating the case to trial would be "time consuming" and "inevitable appeals would likely prolong the litigation, and any recovery by class members, for years" (internal quotation marks omitted) (citation omitted)).

Although Plaintiffs believe that the case against Defendants is strong, it is far from clear that Plaintiffs would have prevailed had the case not settled. Class action lawsuits asserting similar claims have faced substantial legal hurdles. One court observed that such cases "arise out of the anomalies which exist in the American system of providing health care," and suggested that the plaintiff in the case before it was asking the court "to solve the problems of the American health care system," thus "seek[ing] judicial intervention in a political morass." *DiCarlo v. St. Mary's Hosp.*, Civil Action No. 05-

1665 (DRD-SDW), 2006 U.S. Dist. LEXIS 49000, at *12-13 (D. N.J. July 19, 2006).

The court opined that "to presume to address these problems would be rushing in where

angels fear to tread." *Id.*  Several courts have denied class certification in similar cases.

*See Doster v. Pomona Valley Hosp. Med. Ctr.*, No. B280005, 2018 Cal. App. Unpub.

LEXIS 3614, at *1 (Cal. Ct. App. May 25, 2018) (affirming denial of class certification

because "damages for overbilling of [medical] services requires individual

determinations"); *Caudle v. NorthBay Healthcare Grp.*, No. A148912, 2017 Cal. App.

Unpub. LEXIS 8807 (Cal. Ct. App. Dec. 22, 2017) (affirming denial of class certification

on ascertainability and predominance grounds in a case challenging the reasonableness of

a hospital's standard rates); *Hefczyc v. Rady Children's Hospital-San Diego*, 17 Cal. App.

5th 518 (2017) (affirming denial of class certification on predominance and superiority

grounds in a case challenging the reasonableness of charges for medical services).  While

Plaintiffs believe that those cases are readily distinguishable from this case, Plaintiffs are

cognizant of the significant challenges, risks, and uncertainties inherent is consumer class

litigation challenging the reasonableness of rates charged for health care services.  The

proposed Settlement provides outstanding benefits, especially in light of the complexity,

expense, duration, and risks of continued litigation.

**b.     The Range of Possible Recovery.**

But perhaps the most salient consideration is that, even assuming that Plaintiffs

would ultimately prevail, it is highly unlikely that Plaintiffs would achieve a better result

for the Settlement Class by litigating the case through trial and appeal.  This is because

19

the Settlement offers the Settlement Class extraordinary relief:  Settlement Class

Members who submit a valid claim can make a complete or near-complete monetary

recovery.  The relief available under the Settlement likely exceeds what could have been

recovered at trial; Defendants would surely argue that "Allowable Charges" (i.e., the

maximum amount deemed payable by a health insurer or plan for the out-of-network

services) are unreasonably low, and a jury might find the "reasonable value" of the

services to be somewhere between the Allowable Charge and the billed charges.

Complete monetary relief is an exceptional result for any settlement, but particularly so

when it is likely a significantly better result than what class members could have obtained

on their own.  Moreover, the Settlement provides valuable injunctive relief that may help

patients in Texas, including Class Members, avoid unexpected bills in the future.

> **c.   The Effectiveness of the Proposed Method of Distributing Relief to the Class.**

The proposed Settlement is fair, reasonable, and adequate given the risks and

expense of further litigation, and its claims-made structure does not compel a different

conclusion.  While the Parties discussed a direct-pay structure, Defendants' firm position,

now and throughout the course of the settlement negotiations, is that a claims-made

process is not just preferable, but necessary.  *See* Waldman Decl., ¶ 24.  Regardless of

whether Defendants could feasibly identify and provide direct write-offs and/or refunds, a

point of contention, what is clear is that Defendants would not agree to a direct-pay

settlement.  Settlements are borne of compromise, and Plaintiffs, like this Court, had to

weigh the benefits of the settlement actually presented against the risks and expense of further litigation.

And the benefits of the Settlement are substantial. As previously discussed, the Settlement offers Class Members the opportunity to make a complete monetary recovery and provides for valuable injunctive relief.  That is an extraordinary result, and the requirement that a Class Member submit a Claim Form and supporting documentation in order to obtain the monetary relief available under the Settlement does not impose an undue burden on Class Members.  The Parties sought to make the Claim Form as clear and simple as possible.  *See* Waldman Decl., ¶ 23; Settlement Agreement, Exhibit A (Claim Form).  Similarly, the Notice materials explain, in easily understandable language, exactly what a Class Member must do in order to obtain the monetary benefits available under the Settlement.  *See* Settlement Agreement, Exhibit B (Long-Form Notice).  If there is a curable defect in a Settlement Class Member's Claim, the Claims Administrator will contact the Settlement Class Member and give the Settlement Class Member a chance to fix the defect.  *See* Settlement Agreement, Exhibit A (Claim Form).

Plaintiffs are convinced that the claims-made Settlement here represents the best (and perhaps only) way to afford prompt, meaningful relief to Class Members struggling with contested medical debt.  The process for distributing relief to the Class should be found to be fair, reasonable, and adequate.

**d.      The Terms of the Proposed Award of Attorneys' Fees.**

The Settlement Agreement contemplates that Plaintiffs will apply for an award of attorneys' fees and costs in the negotiated amount of $450,000, to be paid by Defendants, separate from and in addition to the relief already discussed, if and to the extent allowed by the Court.  Settlement Agreement, 9.  The requested fee is reasonable in light of the work performed and risk assumed by Plaintiffs' counsel in litigating this matter.  This is quite plainly not a case where a settlement provides little value for the class but a lot of value for class counsel.  Plaintiffs' counsel achieved an excellent result for the Class and will make an application for only a modest fee, which if awarded, will not diminish the monetary relief available to Claimants under the Settlement.

Importantly, approval of attorneys' fees and costs is entirely separate from approval of the Settlement, and neither Plaintiffs nor Plaintiffs' counsel may terminate the Settlement based on this Court or any appellate court's ruling as to the propriety or amount of an award of attorneys' fees and costs.  Settlement Agreement, 9.3.

**e.      Other Agreements Made in Connection with the Proposal.**

Rule 23(e)(2)(C)(iv) mandates that the Court consider any additional agreements made by the Parties in connection with the Settlement.  Here, no such agreements have been made.

**f.      Opinions of Class Counsel, Class Representatives, and Absent Class Members.**

Plaintiffs' counsel and the Representative Plaintiffs fully support the proposed Settlement.  Waldman Decl., ¶¶ 25, 28.  As previously discussed, Plaintiffs' counsel have

22

been investigating out-of-network balance billing by physician staffing companies for years and have litigated multiple class actions challenging the practices of Defendants Envision and EmCare, two of which have already been granted final approval after settlement. Plaintiffs' counsel have a strong understanding of the facts and legal theories underpinning this Action, the risks of further litigation, and the benefits of the proposed Settlement, and Plaintiffs' counsel firmly believe that the Settlement is fair, reasonable, adequate, and in the best interests of the Class. *See Marcus v. J.C. Penney Co., Inc.*, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class and the court is not to substitute its own judgment for that of counsel.") Moreover, the Representative Plaintiffs also strongly endorse the Settlement. Kaur Decl., ¶ 11; Dorin Decl., ¶ 10.

### 4. The Settlement Treats Settlement Class Members Equitably.

The proposed Settlement does not improperly grant preferential treatment to the Representative Plaintiffs or any segment of the Class. The proposed Settlement contemplates modest service awards of $2,500 to the Representative Plaintiffs, if and to the extent approved by this Court. Settlement Agreement, 8. Plaintiffs' counsel believe that the proposed service awards are warranted given the time and effort that the Representative Plaintiffs have expended in pursuing the litigation and the degree to which the Class has benefitted from their efforts. However, should this Court disagree and decline to approve any such award, it would have no impact on the Settlement, which is

not conditioned on the payment of service awards. The contemplated service awards are not disproportionately large nor tied to the amount of the Settlement, and are not conditioned on the Representative Plaintiffs' support of the Settlement. Any such awards would be paid separately by Defendants and would not diminish the relief afforded to the Class. In light of the foregoing considerations, the contemplated service awards do not create a conflict of interest or represent improper preferential treatment of the Representative Plaintiffs.

The Representative Plaintiffs are otherwise entitled to relief under the Settlement on the same basis as other Class Members. The same criteria and formula will be uniformly applied to all claims submitted by Class Members. While the recoveries of individual eligible claimants may vary, any differences merely reflect differences in the facts underlying their claims.

This case simply does not involve the kind of procedural defects or unfair or inadequate substantive terms that raise questions about the propriety of a proposed settlement. The proposed Settlement represents an extraordinary result for the Class, especially in light of the risks of continued litigation, and this Court will assuredly be able to approve the proposed Settlement as fair, reasonable, and adequate.

**C.    The Court Will Likely Be Able to Certify the Class for Purposes of Settlement**

Before a court directs notice to the class, the court must be satisfied that it will likely be able to certify the class for settlement purposes. Fed. R. Civ. P. 23(e)(1)(B).

A party seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Second, the proposed class must satisfy Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23(b)(3) authorizes class certification where common questions of law or fact predominate over any individual questions and a class action is superior to other available means of adjudication. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

While "[t]he ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement," Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment, this Court will likely be able to certify the proposed Class because the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and the dual requirements of predominance and superiority under Rule 23(b) are all satisfied here.

First, the proposed Class is so numerous that joinder of all members is impracticable. While there is no fixed number that satisfies the numerosity requirement, courts generally presume that joinder is impracticable when a class includes more than 100 members. *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999). The exact number of Class Members is not known at this time, but can be determined from

25

Defendants' records.  Waldman Decl., ¶ 20.  Defendants expect the Class to number in the hundreds of thousands, easily exceeding the minimum threshold for numerosity and raising a presumption that joinder is impracticable.

Second, there are questions of law and fact common to the Class Members.  "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'"  *Mullen*, 186 F.3d at 625 (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).  This Action raises numerous questions of law and fact common to the Class, and, importantly, has the capacity "to generate common answers apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350. For example, Plaintiffs allege that Defendants routinely failed to make the necessary disclosures regarding out-of-network providers at in-network hospitals, and this common question of fact has the potential to generate a common answer relevant to all Class Members. Relatedly, another common question is whether, in the absence of an express contract between a patient and a provider of emergency medical services, the provider is entitled to charge whatever it wishes or must only charge the fair market value of the services rendered.  Again, the resolution of this common question has the potential to advance— or defeat—all Class Members' claims in one fell swoop.  Because key issues at the center of this case may be resolved on a class-wide basis, the "not demanding" test for commonality is satisfied.

Third, Plaintiffs' claims are typical of the claims of the Class. "Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625. Plaintiffs' claims are typical of the claims of the Class because they arise out of the same alleged common course of conduct by Defendants and are premised on the same legal theory. *See id.* Like the other Class Members, Plaintiffs were billed at rates unilaterally set by Defendants, rates that Plaintiffs contend far exceed the fair market value that Defendants are entitled to in the absence of an express agreement governing the emergency services provided. In fact, Plaintiffs bring no individual claims, only claims based on the same legal theories as the Class claims. The typicality requirement is, therefore, satisfied.

Fourth, Plaintiffs and their counsel have fairly and adequately protected the interests of the Class. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 625-26. Here, the interests of the Representative Plaintiffs and other Class Members are directly aligned. Plaintiffs' counsel has extensive experience in class action litigation and can fairly and adequately protect the interests of the Class. This Action has been vigorously prosecuted, with the adequacy of Plaintiff's counsel perhaps best demonstrated by the outstanding result obtained for the Class.

Fifth, the questions of law and fact common to Settlement Class Members predominate over any individual questions. As previously discussed, this case involves multiple common questions that can be resolved for all Class Members in a single

27

adjudication, with the answers to those questions apt to drive the resolution of the litigation. To give a third example, another key issue is whether Defendants' billed charges were unreasonable. This can be demonstrated with common proof in the form of a formula for determining fair market value that is consistent with the governing legal standards. Put another way, the fair market value of emergency medical services for patients at in-network emergency rooms in Texas can be determined using uniform methodologies. The methodology used in formulating the monetary benefits of the Settlement—based on Allowable Charges—is one such uniform methodology. *See Bozarth*, Case No. 5:17-cv-01935-FMO-SHK, Order Re: Final Approval of Class Action Settlement, dated June 30, 2020 (ECF No. 105).

Defendants' alleged liability arises from an alleged common course of conduct; consequently, the central issues in this case are common to the Class and predominate over any individual issue that might arise. Because this litigation involves a common nucleus of facts and potential legal remedies, common issues predominate.

Sixth, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The amount of the claims of the Class Members, while significant to the average person, are nonetheless too small to justify the expense of individual actions.[4] Indeed, there is no evidence at this point that Class Members have any interest in controlling prosecution of their claims separately, as Plaintiffs are unaware

---

[4] For example, Plaintiff Kaur was balance billed $2,844.97, while Plaintiff Dorin was balance billed $449.

of any related pending litigation. In light of the size of the putative Class Members'

potential individual recoveries and the costs of litigation, a class action is not just the

superior method of adjudication, but quite possibly the only feasible means for

adjudication of their claims.

Because all the prerequisites for class certification are met, this Court should find

that it will likely be able to certify the proposed Class. *See Bozarth*, Case No. 5:17-cv-

01935-FMO-SHK, Order Re: Final Approval of Class Action Settlement, dated June 30,

2020 (ECF No. 105) (certifying virtually identical settlement class in action against most

of the same defendants for the same alleged conduct). As this Court will likely be able to

approve the proposed Settlement and certify the proposed Class for purposes of

settlement, the sole remaining issue is the adequacy of the proposed Notice.

### D.    The Proposed Notice Warrants Approval

Rule 23(c)(2)(B) requires "the best notice that is practicable" to class members,

"including individual notice to all members who can be identified through reasonable

effort." Both the procedure for providing notice and the content of the notice must be

scrutinized to ensure class members receive the best practicable notice. A court should

consider whether notice will effectively reach the class; whether it will actually come to

the attention of the class; whether notice materials are informative and easy to read; and

whether class members' rights and options are easy to act on.

### 1.    The Proposed Method of Giving Notice Warrants Approval.

Notice will be given by mailing a Postcard Notice directly to individual Class Members and making a detailed Long-Form Notice available to Class Members on the settlement website and, upon request, by mail.[5]  Defendants regularly communicate with patients through the mail, making individual notice by mail practicable and likely the most effective means of communication.

Defendants, who maintain a contact database that is used for billing, will provide the Claims Administrator with a Notice Database containing the last known addresses of Class Members.  The Claims Administrator will check each address against the United States Post Office National Change of Address Database before the initial mailing of the Postcard Notice; conduct a reasonable search to locate an updated address for any Class Member whose Postcard Notice is returned as undeliverable; will update addresses and re-mail the Postcard Notice based on any forwarding information received; and will update addresses based on any requests received from Class Members.  U.S. mail is a time-honored method of notice, and the procedure here works to ensure that notice effectively reaches the Class.

### 2.    The Form and Substance of the Proposed Notice Warrants Approval.

In order for notice to be adequate, it must not only reach class members, but must be understandable to the average class member.  The proposed Postcard Notice and

---

[5] The same proposed method of giving notice—mailing a Postcard Notice and making available a Long-Form Notice—was approved (and effectuated) in the *Kline* case.

Long-Form Notice use clear, concise, and easily understood language. They were designed to command the attention of Class Members, and to make significant information immediately and easily identifiable.

The Postcard Notice provides important information about the proposed Settlement and Class Members' rights and options: it explains what the case is about; what benefits are available under the proposed Settlement; who is affected; and what options a Class Member has. It directs recipients to a settlement website for more information about the Settlement, and clearly explains how to obtain a Long-Form Notice, Claim Form, and Opt-Out/Exclusion Form. The Long-Form Notice explains what exactly a Class Member must do to obtain a write-off or refund, request exclusion, or object to the Settlement.

The topics covered in the proposed Notice (the Postcard Notice and Long-Form Notice, collectively) include: the nature of the Action and Plaintiffs' claims; the Class definition, and what a recipient can do if they are unsure whether they are a Class Member; the terms of the Settlement, including the relief available and the claims that Class Members will release; procedures for submitting a Claim; procedures for requesting exclusion or objecting to the Settlement; what will happen if a Class Member elects to do nothing; the date, time, and place of the Final Approval Hearing; and how to obtain additional information regarding the Settlement. In sum, the proposed Notice provides sufficient information to enable Class Members to make a decision about what to do—whether they should accept the benefits of the Settlement and submit a Claim

31

Form, opt out and pursue their own remedies, or object to any aspect of the Settlement—and then act on that decision.

The proposed method of giving notice and the form and content of the proposed Notice fully comply with the requirements of Rule 23(c)(2)(B), due process, and all other applicable laws and rules, and this Court should approve the proposed Notice as "the best practicable notice."

## V.    <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement and direct notice of the proposed Settlement to the Class.

DATED: February 1, 2021

Respectfully submitted,

**WOLF POPPER LLP**

By: <u>*s/ Chet B. Waldman*</u>
Chet B. Waldman (admitted *pro hac vice*)
Patricia I. Avery (admitted *pro hac vice*)
David A. Nicholas (S.D. Tx. Bar No. 896677)
Elissa M. Hachmeister (admitted *pro hac vice*)
845 Third Avenue, 12th Floor
New York, New York 10022
cwaldman@wolfpopper.com
pavery@wolfpopper.com
dnicholas@wolfpopper.com
ehachmeister@wolfpopper.com
 (212) 759-4600

      and

Jeffrey W. Chambers

32

711 Louisiana, Suite 215
Houston, TX 77002
jchambers@wolfpopper.com
 (713) 438-5244

***Attorneys for Plaintiffs***